BRANDON MICHAEL PICKENS,     )
                                    )
          Plaintiff,        )
                                    )
vs.                           )
                                    )
ROBERT C. LEWIS, et al.,       )            **ORDER**
                                    )
          Defendants.     )
_____)

**THIS MATTER** comes before the Court on the following motions: a Motion for Summary Judgment by Defendant J. Rickman, (Doc. No. 83), and a Motion for Summary Judgment by Defendants Beddingfield, Lancaster, Lewis, White, and Yearick, (Doc. No. 89).

## I.    BACKGROUND

### A.    Procedural Background

Pro se Plaintiff Brandon Pickens, a former North Carolina inmate, filed this action under 42 U.S.C. § 1983, alleging that the moving Defendants were deliberately indifferent to Plaintiff's serious medical needs while Plaintiff was incarcerated at Piedmont Correctional Institution ("PCI") and Mountain View Correctional Institution ("MVCI"). First, as to Dr. Rickman, a dentist who provided dental treatment to inmates at MVCI, Plaintiff alleges that Dr. Rickman was deliberately indifferent to Plaintiff's serious needs for dental care while Plaintiff was housed at MVCI between August and December 2012. See (Doc. No. 9 at ¶¶ 8 and 73). As to the remaining Defendants, Plaintiff generally alleges that, between August 1, 2012 and December 14, 2012 while housed as an inmate at PCI and later at MVCI, mental health staff did not

reasonably and appropriately address his mental health needs.

Plaintiff filed his original Complaint on December 9, 2015, and he filed an Amended Complaint on February 18, 2016.  See (Doc. Nos. 1, 9).  On October 12, 2017, Defendant Rickman filed his pending summary judgment motion.  (Doc. No. 83).  On October 31, 2017, Defendants Beddingfield, Lancaster, Lewis, White, and Yearick filed their pending summary judgment motion.  (Doc. No. 89).  On November 6, 2017, this Court entered an order, in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motions and of the manner in which evidence could be submitted to the Court.  (Doc. No. 91).  Plaintiff has filed a response to the summary judgment motions.

### B.      Factual Background

### 1. Plaintiff's Deliberate Indifference Claim against Dr. Rickman Related to Plaintiff's Dental Care Needs

Plaintiff's claim against Dr. Rickman arises out of dental treatment Plaintiff received, and dental treatment which Plaintiff contends he should have received, while he was incarcerated at MVCI between August and December 2012.  Dr. Rickman is a dentist licensed by the State of North Carolina.  (Doc. No. 84 at ¶ 3: Rickman Affidavit).  He became employed as a full-time dentist by the Department of Public Safety on August 13, 2012, and began seeing inmate patients on August 20, 2012.  (Id. at ¶ 5).  Dr. Rickman was primarily assigned to work at Avery Mitchell Correctional Institution.  (Id.).  No dentist was permanently assigned to MVCI, but Dr. Rickman and other providers rotated through MVCI to see patients there a few days each month.  (Id.).

Dr. Rickman was assigned to work at MVCI one day in August 2012; one day in September 2012; eight days in October 2012; five days in November 2012; and six days total in

December 2012 (only three of which were before Plaintiff was transferred away from MVCI). (Id. at ¶ 6).

Due to the large number of patients compared to the relatively few number of dentists available, the MVCI dental clinic maintained a waiting list of about ninety days for dental procedures such as routine fillings. (Id. at ¶ 7). At the time, DPS policy and record-keeping systems provided that if an inmate was transferred between facilities while he was on the dental waitlist at the old facility, he would have to be reassessed by a dentist at the new facility and then placed at the bottom of that facility's waitlist, depending on treatment needs. (Id. at ¶ 10). There was no official system in place at DPS to integrate or merge the waiting lists of different facilities for transferring inmates. (Id.).

Plaintiff was transferred to MVCI on or about August 13, 2012, and remained there for only about four months before being transferred to Scotland Correctional Institution on December 19, 2012. (Id. at ¶ 4). Before being transferred to MVCI, Plaintiff received an initial dental assessment at PCI by a different dentist on or about July 24, 2012. (Id. at ¶ 9). That dentist noted treatment needs for fillings on teeth #13 and #15, and the extraction of tooth #17 (a wisdom tooth). (Id.). Plaintiff was placed on the wait list at PCI for these procedures, but he was transferred to MVCI before treatment could be completed. (Id.).

Upon arrival at MVCI, Plaintiff submitted three almost identical sick call requests regarding his fillings and wisdom tooth—on August 14, 16 and 25 of 2012. (Id. at ¶ 11). On August 30, 2012, another dentist extracted tooth #17. (Id. at ¶ 12). That same day, Plaintiff submitted a sick call request requesting a check-up and dental cleaning, and was placed on the prophylaxis (cleaning) waitlist on September 6, 2012. (Id.).

Plaintiff missed his October 10, 2012, prophylaxis appointment, but was seen by Dr.

Rickman for the first time on October 12, 2012, for a cleaning. (Id. at ¶¶ 13, 14). Plaintiff requested a full mouth series of x-rays and a dental examination and received the same from Dr. Rickman on October 15, 2012. (Id. at ¶ 14). On that date, Dr. Rickman noted the need for fillings on teeth #13 and #15 and placed Plaintiff on the facility's waitlist for these procedures. (Id.). Tooth #15 was treatment planned for a traditional amalgam filling. Tooth #13 was treatment planned for an Intermediate Restorative Material ("IRM") filling due to extensive decay and the poor prognosis of that tooth. (Id.). Although tooth #13 had a poor, if not hopeless, prognosis, on October 15, 2012, Dr. Rickman exercised his clinical judgment and decided to attempt to save the tooth with a temporary IRM filling. (Id.). If, after placing the IRM filling, the tooth "settled down," and appeared to be salvageable, Dr. Rickman would have proceeded at a later date with a traditional filling. (Id.). However, Dr. Rickman believed that, more likely than not, tooth #13 would eventually require extraction. (Id.).

Over the next two months, before he was transferred from MVCI on December 19, 2012, Plaintiff submitted multiple sick call requests regarding his fillings. (Id. at ¶ 15). Each time, the dental hygienist reminded Plaintiff that he was already on the waitlist, which at all times was at least ninety days long. (Id.). While at MVCI, Plaintiff di not did declare a dental emergency (which all inmates can do at any time) regarding his fillings. (Id. at ¶ 16). Indeed, Plaintiff's dental needs regarding teeth #13 and #15 were routine and did not require immediate or urgent intervention. (Id. at ¶ 14).

Dr. Rickman asserts in his affidavit that he provided Plaintiff with appropriate and timely dental care and treatment and was in no way indifferent to his dental needs. (Id. at ¶ 17). Dr. Rickman saw Plaintiff promptly, took a full mouth series of dental x-rays, completed a comprehensive examination, diagnosed his treatment needs, and placed Plaintiff on the facility's

waitlist for his fillings. (Id.). In doing so, Dr. Rickman exercised his clinical judgment in triaging Plaintiff and his treatment needs. (Id.). Due to the number of inmates who had dental needs at MVCI, in conjunction with the few number of days that Dr. Rickman was actually assigned to MVCI to provide dental treatment, Plaintiff's fillings were unable to be scheduled for completion before Plaintiff was transferred away from MVCI on December 19, 2012. (Id.).

Plaintiff's tooth #15 was restored with a simple filling on or about March 13, 2013, (as Dr. Rickman planned to do himself had Plaintiff remained at MVCI) and remains fully functional. (Id. at ¶ 18). Tooth #13, which Dr. Rickman felt had a poor prognosis and might require extraction, was in fact extracted on or about February 14, 2014. (Id.).

Dr. Larry Ray, a general dentist licensed by the State of North Carolina, has reviewed and evaluated the care provided to Plaintiff. (Doc. No. 85 at ¶ 3: Ray Aff.). Dr. Ray asserts that, in his professional expert opinion, Dr. Rickman's treatment of Plaintiff was appropriate and that he was not indifferent to Plaintiff's dental needs. (Id. at ¶ 8). Dr. Ray opines that Plaintiff's teeth #13 and #15 were not in need of immediate fillings and did not constitute a serious dental need. (Id.). Dr. Ray asserts that it was therefore entirely appropriate for Plaintiff to be placed on the dental waiting list at MVCI for those fillings. (Id.). Furthermore, it is Dr. Ray's opinion that Plaintiff has suffered no harm that is attributable to any action or inaction of Dr. Rickman. (Id.). Dr. Ray notes that Tooth #15 was filled on March 13, 2013, and Plaintiff was not harmed by any delay. (Id. at ¶ 7). The prognosis for tooth #13 was already poor, if not hopeless, when Dr. Rickman first saw Plaintiff. (Id. at ¶ 6). According to Dr. Ray, even if Dr. Rickman had been able to perform the planned IRM filling on #13, more likely than not Plaintiff would have lost the tooth anyway, and the tooth was, in fact, extracted on February 14, 2014. (Id.). Finally, Dr. Ray opines that Dr. Rickman's inability to place fillings before Plaintiff was transferred from

MVCI did not harm Plaintiff or affect his dental outcome.  (Id. at ¶ 8).

**2. Plaintiff's Deliberate Indifference Claim against Defendants Lewis, Beddingfield, White, Lancaster, and Yearick Related to Plaintiff's Mental Health Care Needs**

As to the remaining Defendants, Plaintiff has brought a claim against them for deliberate indifference to serious medical needs, based on his allegation that Defendants were deliberately indifferent to his mental health needs.  Specifically, Plaintiff alleges that, on October 17, 2012, he "requested to be placed back on [his] mental health medication and be transferred to another prison facility."  (Doc. No. 9 at ¶ 31).  The following day, Plaintiff submitted a request to see a mental health care provider and, on October 19, 2012, was evaluated.  (Id. at ¶ 33).  With respect to the moving Defendants, Plaintiff states that he wrote a letter to "the Director of Prisons" raising "problems concerning [his] mental health care and [Defendant] Yearick's failure to accommodate [his] mental health needs."  (Id. at ¶ 38).  Plaintiff alleges that, a short time later, he met with Defendant White while in segregation, at which point Defendant White allegedly told him that "she was going to help [him] get back on [his] mental health medications," among other things.  (Id. at ¶ 43).

Plaintiff's next contact with Defendant White was by letter when she responded in writing to his request for permission to correspond with his brothers, who were also incarcerated within NCDPS facilities.  (Id. at ¶¶ 48-49).  In her response, Defendant White advised Plaintiff to "submit a request to [his] case manager to begin the approval process . . . ."  (Id. at ¶ 49).  As for Defendant Lewis, Plaintiff claims that Dr. John S. Carbone responded to a letter Plaintiff had written Defendant Lewis on November 7, 2012, complaining about his mental health care.  (Id.).  According to Plaintiff, copies of Dr. Carbone's response were sent to Defendant Lewis and Defendant Yearick, but Defendant Yearick never met with Plaintiff to address his concerns.

(Id.).  On November 28, 2012, Plaintiff received a letter from Defendant Beddingfield in response to correspondence Plaintiff had sent to Defendant Lancaster.  (Id. at ¶ 50).  According to Plaintiff, Defendant Beddingfield advised him that his letter had been "forwarded to [Defendant] White for review and disposition."  (Id.).

Finally, Plaintiff claims that, on December 4, 2012, he received a written response from Defendant White to a letter Plaintiff had written to Defendant Lewis.  (Id. at ¶ 54).  According to Plaintiff, Defendant White's response "acknowledged that she ha[d] received numerous letters and requests forms" and "admitted that she was aware of [Plaintiff's] concerns relating to . . . proper mental health care and a transfer," but that no further action was taken.  (Id.).  Then, on December 18, 2012, Plaintiff received a written response from Defendant White to a letter he had addressed to Defendant Lewis "about numerous concerns regarding conditions [to] which [he] was subjected at MCVI.  The concerns which I addressed included grievance problems, confiscated personal property, spoiled food, kitchen sanitation, and staff racial prejudice."  (Id. at ¶ 61).  Plaintiff complains that Defendant White took no further action.  (Id.).  Plaintiff does not allege that Defendants Lewis, Beddingfield, White, or Lancaster provided any mental health, psychiatric, or psychological care to him or that they directly oversaw or supervised any such care rendered by others.

In support of their motion, Defendants have submitted their own affidavits, as well as affidavits from various non-parties.  See (Doc. No. 90-1: Aff. of Katie Smith, Defs. Ex. A; Doc. No. 90-2: Aff. of Lori Hall, Defs. Ex. B; Doc. No. 90-3: Aff. of Ken Yearick, Defs. Ex. C; Doc. No. 90-4: Aff. of Anna Jamieson, Defs. Ex. D).  Defendant Yearick served as a Psychological Programs Manager for NCDPS from 2007 until 2015 and, so, provided, among other things, clinical oversight to the mental health staff at MCVI, ensured compliance with State mental

health practices, and reviewed patient charts and notes made by nursing, psychiatric, and other clinical staff. (Doc. No. 90-3 at ¶¶ 3, 5).

At the time of the incidents asserted in the Amended Complaint, Defendant Lancaster served as the Chief Deputy Secretary of Adult Corrections for NCDPS. (Doc. No. 63 at ¶ 11). Defendant Lewis served as the Director of Prisons for NCDPS from January 2009 until January 2013. (Doc. No. 39 at ¶ 4). Defendant Beddingfield previously served as an Executive Assistant in the Communications Office of NCDPS. (Id. at ¶ 12). Defendant White served as the Correctional Administrator at MVCI. (Id. at ¶ 7). Non-party Lori Hall served as a Staff Psychologist at MCVI from 2014 through 2016, and, among other things, administered medications, provided clinical oversight to the mental health staff, and reviewed patient records in order to deliver care. (Doc. No. 90-2 at ¶¶ 3, 5). Non-party Katie Smith, M.S., served as Psychological Services Coordinator at PCI from July 2012 until December 2014, then again from May 2015 to the present, and was responsible for providing psychological services to inmates at the facility, supervising the subordinate mental health staff, and overseeing the treatment programming at the facility. (Doc. No. 90-1 at ¶¶ 3, 5). Finally, non-party Anna Jamieson, M.D., served as a psychiatrist at PCI from October 2010 until October 2012 and, among other things, evaluated patients, administered medication, delivered mental health care to patients, and provided clinical oversight to the facility's mental health staff. (Doc. No. 90-4 at ¶¶ 3, 5).

Defendants Lewis, Beddingfield, White, and Lancaster were not healthcare providers and were not responsible for providing clinical care to inmates at PCI or MCVI, nor were they responsible for supervising clinical providers at either facility. (Doc. No. 90-3 at ¶ 7; Doc. No. 90-2 at ¶ 7; Doc. No. 90-1 at ¶ 7; Doc. No. 90-4 at ¶ 7). In addition, non-medical correctional officials such as Defendants Lewis, Beddingfield, White, and Lancaster had limited access to

inmate health information pursuant to the Health Insurance Portability and Accountability Act. (Doc. No. 90-3 at ¶ 8; Doc. No. 90-2 at ¶ 8; Doc. No. 90-4 at ¶ 8; Doc. No. 90-4 at ¶ 8).

Non-party Lori Hall served as a Staff Psychologist at MCVI from 2014 through 2016, and, among other things, administered medications, provided clinical oversight to the mental health staff, and reviewed patient records in order to deliver care. (Doc. No. 90-2 at ¶¶ 3, 5). Non-party Katie Smith, M.S., served as Psychological Services Coordinator at PCI from July 2012 until December 2014, then again from May 2015 to the present, and was responsible for providing psychological services to inmates at the facility, supervising the subordinate mental health staff, and overseeing the treatment programming at the facility. (Doc. No. 90-1 at ¶¶ 3, 5). Finally, non-party Anna Jamieson, M.D., served as a psychiatrist at PCI from October 2010 until October 2012 and, among other things, evaluated patients, administered medication, delivered mental health care to patients, and provided clinical oversight to the facility's mental health staff. (Doc. No. 90-4 at ¶¶ 3, 5).

Pursuant to the NCDPS policy and procedures, all inmates can access routine healthcare through the sick call process. (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9; Doc. No. 90-4 at ¶ 9). Routine health care needs, to include medical, dental, and mental health are addressed through the Sick Call Process. (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9; Doc. No. 90-4 at ¶ 9). Sick Call Process Forms are readily available in all inmate-housing areas and upon request. (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9; Doc. No. 90-4 at ¶ 9). Sick Call Requests are then routed to the appropriate health care provider and individual appointments are scheduled. (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9; Doc. No. 90-4 at ¶ 9). Emergency Services are also processed through health care services. (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9;

Doc. No. 90-4 at ¶ 9).  All inmates have the ability to declare a medical emergency.  (Doc. No. 90-3 at ¶ 9; Doc. No. 90-2 at ¶ 9; Doc. No. 90-1 at ¶ 9; Doc. No. 90-4 at ¶ 9).  If an inmate declares a medical emergency, he becomes a priority.  (Doc. No. 90-3 at ¶ 10; Doc. No. 90-2 at ¶ 10; Doc. No. 90-1 at ¶ 10; Doc. No. 90-4 at ¶ 10).  In those circumstances, the inmate will be assessed by medical immediately.  (Doc. No. 90-3 at ¶ 10; Doc. No. 90-2 at ¶ 10; Doc. No. 90-1 at ¶ 10; Doc. No. 90-4 at ¶ 10).

Plaintiff regularly sought and received mental health and/or psychiatric treatment while housed at both PCI and MVCI.  (Doc. No. 90-3 at ¶ 12; Doc. No. 90-2 at ¶ 12; Doc. No. 90-1 at ¶ 12; Doc. No. 90-4 at ¶ 12).  Plaintiff contends that, on August 1, 2012, Katie Smith, M.S, performed a mental health assessment on Plaintiff at PCI.  (Doc. No. 90-1 at ¶ 15; Doc. No. 90-3 at ¶ 15; Doc. No. 90-2 at ¶ 15; Doc. No. 90-4 at ¶ 15).  However, before that date, and as part of a health screening at PCI on July 20, 2012, Plaintiff denied that he had a current mental health complaint and denied that he wanted any mental health treatment.  (Doc. No. 90-1 at ¶ 15; Doc. No. 90-3 at ¶ 15; Doc. No. 90-2 at ¶ 15; Doc. No. 90-4 at ¶ 15).  Plaintiff also denied at that time that he had ever been treated for mental health or emotional problems.  (Doc. No. 90-1 at ¶ 15; Doc. No. 90-3 at ¶ 15; Doc. No. 90-2 at ¶ 15; Doc. No. 90-4 at ¶ 15).

As part of the "Mental Health Assessment" performed by Ms. Smith on August 1, 2012, Plaintiff denied symptoms of an anxiety, mood, or psychotic disorder.  (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc. No. 90-4 at ¶ 16).  Plaintiff also denied the need for ongoing mental health treatment, despite having been prescribed Zyprexa and Vistaril.  (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc. No. 90-4 at ¶ 16).  Plaintiff subjectively rated his current overall distress a "0" on a scale from "0" (no distress) to 10 (extreme distress).  (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc.

No. 90-4 at ¶ 16). At that time, Ms. Smith assessed Plaintiff as showing no current symptoms of an anxiety, mood, or psychotic disorder. (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc. No. 90-4 at ¶ 16). According to Ms. Smith's assessment, Plaintiff further showed no overt signs of distress and denied the need for ongoing mental health treatment. (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc. No. 90-4 at ¶ 16). Accordingly, Ms. Smith anticipated that, as of August 1, 2012, Plaintiff would be discontinued from the mental health caseload and that, due to the absence of a significant mental health disorder, there was no current need for Plaintiff to schedule a follow-up appointment with psychology staff. (Doc. No. 90-1 at ¶ 16; Doc. No. 90-3 at ¶ 16; Doc. No. 90-2 at ¶ 16; Doc. No. 90-4 at ¶ 16).

Eight days later, on August 9, 2012, Plaintiff underwent a Psychiatric Evaluation performed by Anna Jamieson, M.D. (Doc. No. 90-4 at ¶ 19; Doc. No. 90-3 at ¶ 19; Doc. No. 90-2 at ¶ 19; Doc. No. 90-1 at ¶ 19). On the day of the evaluation, Plaintiff had not taken his mental health medications for over a week and requested to discontinue all mental health treatment. (Doc. No. 90-4 at ¶ 19; Doc. No. 90-3 at ¶ 19; Doc. No. 90-2 at ¶ 19; Doc. No. 90-1 at ¶ 19). Plaintiff specifically reported to Dr. Jamieson that he had been prescribed those medications in the county jail for insomnia, a problem he reported had since resolved. (Doc. No. 90-4 at ¶ 19; Doc. No. 90-3 at ¶ 19; Doc. No. 90-2 at ¶ 19; Doc. No. 90-1 at ¶ 19). Plaintiff also self-reported to Dr. Jamieson having stable mood, appetite, sleep, and energy, and denied suicidal or homicidal ideation, thoughts of harm or escape, as well as symptoms of mania or psychosis. (Doc. No. 90-4 at ¶ 19; Doc. No. 90-3 at ¶ 19; Doc. No. 90-2 at ¶ 19; Doc. No. 90-1 at ¶ 19).

According to the "Mental Status Exam" performed by Dr. Jamieson, Plaintiff was fully oriented and without evidence of cognitive deficits. (Doc. No. 90-4 at ¶ 20; Doc. No. 90-3 at ¶

20; Doc. No. 90-2 at ¶ 20; Doc. No. 90-1 at ¶ 20).  His global AIMS exam was "0" or normal/negative.  (Doc. No. 90-4 at ¶ 20; Doc. No. 90-3 at ¶ 20; Doc. No. 90-2 at ¶ 20; Doc. No. 90-1 at ¶ 20).  As a result, Dr. Jamieson assessed Plaintiff as an inmate who was placed on medications for insomnia who was sleeping well and whose request to discontinue psychiatric treatment, including medications, was reasonable.  (Doc. No. 90-4 at ¶ 20; Doc. No. 90-3 at ¶ 20; Doc. No. 90-2 at ¶ 20; Doc. No. 90-1 at ¶ 20).  Dr. Jamieson discontinued Plaintiff's prescriptions for his psychotropic medications, including Zyprexa and Vistaril, as well as any future plans for psychiatric treatment, although Plaintiff was instructed to follow-up with mental health on an as-needed basis.  (Doc. No. 90-4 at ¶ 20; Doc. No. 90-3 at ¶ 20; Doc. No. 90-2 at ¶ 20; Doc. No. 90-1 at ¶ 20).

As part of a "Health Screening" at MVCI on August 13, 2012, Plaintiff again denied that he had a current mental health complaint.  (Doc. No. 90-3 at ¶ 21; Doc. No. 90-2 at ¶ 21; Doc. No. 90-1 at ¶ 21; Doc. No. 90-4 at ¶ 21).  According to a "Mental Health Progress Note" authored by Staff Psychologist Lori Hall on October 19, 2012, Plaintiff's mental health interview and testing results were highly suggestive of malingering or feigning.  (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3 at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22).  From her observations, Ms. Hall noted that Plaintiff appeared to be trying to use his alleged mental health problems to effectuate a transfer to another prison facility.  (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3 at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22).  Ms. Hall also determined that Plaintiff had never been diagnosed with a serious mental illness such as a psychosis and that, despite his answers on the mental health testing, there was no indication that Plaintiff was responding to external stimuli or voices, experiencing hallucinations, or that he would have benefited from psychotropic medications, including Zyprexa and Vistaril, at that time.  (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3

12

at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22).

According to Ms. Hall, while Plaintiff did have some mental health issues, they were more character-related and included malingering or feigning his symptoms in an attempt to manipulate the system to get what he wanted. (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3 at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22). Given her assessment that there were no psychotropic medications that would change Plaintiff's behavior, he was not added to the mental health caseload at that time. (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3 at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22). Plaintiff was released from care due to his self-dismissal of mental health problems, the inability of mental health staff to assist him, and his basic goal of trying to use the mental health staff for his own gain. (Doc. No. 90-2 at ¶ 22; Doc. No. 90-3 at ¶ 22; Doc. No. 90-1 at ¶ 22; Doc. No. 90-4 at ¶ 22).

Defendant Yearick also personally evaluated Plaintiff. (Doc. No. 90-3 at at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23). According to the "Mental Health Progress Note" authored by Defendant Yearick on November 2, 2012, Plaintiff self-referred for evaluation. (Doc. No. 90-3 at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23). Dr. Yearick reviewed Plaintiff's previous mental health evaluations, which suggested the absence of prominent Axis I issues, no need for inpatient treatment, malingering/feigning, no request for psychotherapy, demands for medication, and a desire to transfer facilities. (Doc. No. 90-3 at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23). After interviewing Plaintiff, Dr. Yearick advised that no psychiatric referral was planned at that time, and Plaintiff indicated that he was not interested in psychotherapy. (Doc. No. 90-3 at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23). Accordingly, Dr. Yearick did not schedule any future mental health sessions with Plaintiff, but

13

noted that Plaintiff did know how to make a mental health referral if needed. (Doc. No. 90-3 at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23).

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A. Plaintiff's Claims against Defendants in their Official Capacities

First, to the extent that Plaintiff has sued Defendants in their official capacities, a suit against a state official in his official capacity is not a suit against the official but rather a suit against the official's office, Brandon v. Holt, 469 U.S. 464, 471 (1985), any suit against a state official in his official capacity is construed as against the state itself. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). It is well settled that neither a state nor its officials acting in their official capacities are "persons" subject to suit under 42 U.S.C. § 1983. Id.; see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55 (1978).

Moreover, the Eleventh Amendment generally bars lawsuits by citizens against non-consenting states brought either in state or federal courts. See Alden v. Maine, 527 U.S. 706, 712-13 (1999); Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996). Although Congress may abrogate the states' sovereign immunity, it has not chosen to do so for claims under 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 343 (1979). North Carolina has not waived its sovereign immunity by consenting to be sued in federal court for claims brought under 42 U.S.C. § 1983. See generally Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 697 (M.D.N.C. 2013) (claim under 42 U.S.C. § 1983 barred by sovereign immunity of North Carolina which had not been waived). Accordingly, Defendants are entitled to summary judgment as to Plaintiff's claims against him in their official capacities.

### B. Plaintiff's Claims against Defendants in their Individual Capacities

### 1. Plaintiff's Deliberate Indifference Claim against Lewis, Beddingfield, White,

**Lancaster, and Yearick**

**a. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a Section 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, 534 U.S. 516 (2002), the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action in order to further the efficient administration of justice. Id.

In Woodford v. Ngo, 548 U.S. 81 (2006), the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Id. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). In Jones v. Bock, 549 U.S. 199 (2007), the Supreme Court stated: "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211 (citing Porter, 534 U.S. at 524).

Based on the pleadings, Plaintiff did not fulfill his obligation under the PLRA and provide Defendants Lewis, Beddingfield, White, or Lancaster with fair notice of his mental health care claim. In his Complaint, Plaintiff alleged that: (1) Defendant Lewis was "the

16

Director of Prisons [of NCDPS]" who was "legally responsible for the administration of the Division of Prisons and was delegated the authority to act in all matters related to the D.O.P.," (Doc. No. 9 at ¶ 4); (2) Defendant Beddingfield was an "employee of the DOP's communications office," (id. at ¶ 11); (3) Defendant White was the "Superintendent at MVCI" who was "responsible for the administration of MVCI and for the welfare of all the inmates of that prison," (id. at ¶ 7); and Defendant Lancaster was "the Secretary for the DOP and was legally responsible for overseeing the management of DOP," (id. at ¶ 11). Plaintiff does not allege, however, that Defendants Lewis, Beddingfield, White, or Lancaster were directly involved in his mental health care in any fashion, that these Defendants deliberately interfered with his medical care, or that these Defendants "tacitly authorized" or were "indifferent" to constitutional violations by their subordinates.

More importantly, contrary to Plaintiff's allegations, the records of the North Carolina Inmate Grievance Board ("the Board") establish that Plaintiff failed to properly exhaust his administrative remedies against Defendants Lewis, Beddingfield, White, and Lancaster before filing this action. See (Doc. No. 65: Couch Aff., Exs. A through EE). Plaintiff was transferred from PCI to MVCI on August 13, 2012 (Doc. No. 9 at 5), and he filed this action on December 9, 2015. The Step Three Grievance Appeal Records of the Board show that thirty-one Step Three Appeals were received from Plaintiff between those dates. (Doc. No. 65 at ¶ 4: Couch Aff., Exs. A-EE). None of the exhausted grievance appeals provided fair notice to prison officials of complaints or allegations against Defendants Lewis, Beddingfield, White, or Lancaster. (Id.). Accordingly, because Plaintiff brought this present action before exhausting his available administrative remedies, his claims against Defendants Lewis, Beddingfield, White, and Lancaster must be dismissed.

With respect to Defendant Yearick, Plaintiff alleges that Yearick was "a mental health care provider at MVCI." (Doc. No. 9 at ¶ 9). Of the thirty-one Step Three Appeals issued for grievances initiated by Plaintiff between July 20, 2012, and December 9, 2015, only two arguably address mental health concerns, and neither of those grievances dealt with mental health care provided by Defendant Yearick while Plaintiff was housed at MVCI. (Doc. No. 65 at ¶ 4, Exs. A-EE). Specifically, in Grievance No. 4365-13-0739, filed by Plaintiff on November 26, 2013, while he was housed at Lumberton Correctional Institution ("LCI"), Plaintiff requested to be placed on mental health medications and receive a mental health grade. (Doc. No. 65-13 at p. 2). The Step One Response indicated that Plaintiff was seen in the LCI psychiatric clinic by Dr. Atwater, was prescribed psychotropic medications, and was given a mental health grade of A3. (Id. at p. 3). The Step Two and Step Three Responses affirmed the appropriate mental health treatment by the mental health staff at PCI in response to Plaintiff's concerns and considered the grievance resolved. (Id. at pp. 3-4).

Grievance No. 3805-15-283, filed by Plaintiff on May 7, 2015, while housed at Harnett Correctional Institution ("HCI"), dealt with the confidentiality of information shared by inmates with mental health staff at that particular facility. (Doc. No. 66 at ¶ 4.Z: Couch Aff.). Plaintiff did not grieve or complain about his particular mental health treatment, nor did he ask to be placed on mental health medications. (Id.; Doc. No. 66-7 at p. 2). The Step Two and Three responses indicated that mental health staff at HCI did not violate any policy, no further action was warranted, and the grievance was dismissed. (Doc. No. 66 at ¶ 4.Z: Couch Aff.; Doc. No. 66-7 at pp. 6-7).

The grievance records submitted by Plaintiff, (Doc. Nos. 65, 66), fail to mention or identify any conduct whatsoever by Defendant Yearick, whom Plaintiff now complains violated

his constitutional rights, or, even more generally, complaints about mental health care provided to Plaintiff at MCVI. In the only two grievances relating to mental health care, Nos. 4365-13-0739 and 3805-15-283, Plaintiff also makes no specific complaints about Defendant Yearick related to the mental health treatment he provided. In fact, the only involvement that Defendant Yearick had during the relevant time period was the November 2, 2012, "Mental Health Progress Note" authored by Defendant Yearick, and about which Plaintiff did not grieve or complain. See Davidson v. Davis, 3:13-cv-590-FDW, 2014 WL 2696573, at *12 (W.D.N.C. Mar. 5, 2015) (citation omitted) (stating that although an inmate is not required to name each defendant, he is required to put "prison officials on fair notice that Plaintiff was complaining about . . . conduct" related to a specific officer). Here, Plaintiff's grievance is devoid of any allegations related to Defendant Yearick. If a "grievance fails to give prison authorities fair notice of, and the opportunity to address, the problem that will later form the basis of the suit against that defendant, dismissal of that defendant is appropriate." Id. (citation omitted).

Even if this Court were to liberally construe Grievance Nos. 4365-13-0739 and 3805-15-283, they still do not provide NCDPS sufficient factual allegations related to Defendant Yearick to fulfill Plaintiff's obligations under the PLRA. For instance, in Moore, the Fourth Circuit held that a grievance complaining of the inadequacy of Hepatitis C treatment did not discharge the inmate's obligation to exhaust administrative remedies with respect to his claim of inadequate treatment for gout. Moore v. Bennette, 517 F.3d 717, 729 (4th Cir. 2008). The Court rejected the inmate's argument that the inadequate Hepatitis C treatment and the inadequate gout treatment were part of the same overall pattern of inadequate medical care. Id. Additionally, an inmate's grievance must allege the specific conduct forming the basis of the underlying civil action. Sulton v. Wright, 265 F. Supp. 2d 292, 298 (S.D.N.Y. 2003) (holding a grievance must

19

present "the relevant factual circumstances giving rise to a potential claim . . . sufficient under the circumstances to fulfill the basic purposes of the exhaustion requirement"). Plaintiff's failure to comply with the PLRA and fully exhaust his administrative remedies against Defendant Yearick is fatal to any claims against him. See Evans v. Manos, 336 F. Supp. 2d 255 (W.D.N.Y. 2004) (dismissing Section 1983 complaint against dentist for deliberate indifference for failure to exhaust administrative remedies where underlying grievance did not name him or describe conduct attributable to him).

In sum, the evidence on summary judgment shows that Plaintiff failed to exhaust his administrative remedies as to his deliberate indifference claim against the moving Defendants. Thus, Defendants are entitled to summary judgment on this basis alone.

**b. Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs As to Defendants Lewis, Beddingfield, White, Lancaster, and Yearick on the Merits**

The Court further finds that, even if Plaintiff exhausted his administrative remedies before filing this action, Defendants Lewis, Beddingfield, White, Lancaster, and Yearick are nevertheless entitled to summary judgment on the merits of Plaintiff's deliberate indifference claim.

Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76

(4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

Even if Plaintiff had exhausted his administrative remedies as to Defendants Lewis, Beddingfield, White, Lancaster, and Yearick, these Defendants would nevertheless be entitled to

summary judgment alternatively on the merits. First, Lewis, Beddingfield, White, and Lancaster were all non-medical prison officials during the incidents alleged in the Complaint. (Doc. No. 19 at ¶¶ 4, 7, 12; Doc. No. 63 at ¶ 11; Doc. No. 90-3 at ¶ 6; Doc. No. 90-2 at ¶ 6; Doc. No. 90-1 at ¶ 6; Doc. No. 90-4 at ¶ 6). In addition, none of them had any responsibility for providing clinical care to inmates at PCI or MCVI. (Doc. No. 90-3 at ¶ 7; Doc. No. 90-2 at ¶ 7; Doc. No. 90-1 at ¶ 7; Doc. No. 90-4 at ¶ 7). The district courts have repeatedly held that prison officers "without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals." Pulliam v. Superintendent of Hoke Corr. Inst., 1:05CV1000, 2007 WL 4180743, at *6 (M.D.N.C. Nov. 20, 2007) (emphasis added); Maddox v. City of Los Angeles, 792 F.2d 1408 (9th Cir. 1986) (prison officials are not required to provide the medical care). Plaintiff has not alleged that Defendants Lewis, Beddingfield, White, or Lancaster have prevented him from receiving mental health treatment. The Fourth Circuit has specifically held that prison officials are entitled to rely on the opinions, judgment, and expertise of prison medical personnel in determining the course of treatment that is medically necessary and appropriate for an inmate. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995).

Plaintiff has not alleged sufficient facts to support his contention that the actions or inactions of Defendants Lewis, Beddingfield, White, or Lancaster were so grossly incompetent, inadequate, or excessive as to shock the conscience to show deliberate indifference. King, 536 Fed. Appx. at 361. Plaintiff does not allege that these Defendants used their positions to deny him access to mental health care, or that they acted in their positions in a manner that was deliberately indifferent to Plaintiff's serious mental health needs. (Doc. No. 9). Plaintiff also wholly fails to allege that Defendants Lewis, Beddingfield, White, or Lancaster "knew of and

disregarded" an "excessive risk" to Plaintiff's mental health. Instead, Plaintiff makes assertions without adequate factual support to state a claim against Defendants Lewis, Beddingfield, White, or Lancaster. There is no factual content that would allow this Court to draw any reasonable inference that Defendants Lewis, Beddingfield, White, or Lancaster are liable for any misconduct at all. This is especially so where Plaintiff <u>did</u> receive mental health treatment from a variety of mental health professionals at MVCI—including Defendant Yearick—from August 1, 2012 thru November 2, 2012. (Doc. No. 90-3 at ¶¶ 16-23; Doc. No. 90-2 at ¶¶ 16-23; Doc. No. 90-1 at ¶¶ 16-23; Doc. No. 90-4 at ¶¶ 16-23). Therefore, Defendants Lewis, Beddingfield, White, and Lancaster are entitled to summary judgment alternatively on the merits.

Next, as to Defendant Yearick, Plaintiff's simple disagreement with his mental health course of treatment between August 1, 2012 and December 14, 2012, while housed at both MVCI and PCI, and specifically the treatment by Defendant Yearick on November 2, 2012, does not amount to a viable claim under 42 U.S.C. § 1983 for deliberate medical indifference. Instead, the supporting affidavits attached from Plaintiff's mental health providers at PCI and MVCI document the fact that, when required, Plaintiff received reasonable, appropriate, continuous mental health care pursuant to NCDPS policy and procedure. (Doc. No. 90-3 at ¶¶ 16-23; Doc. No. 90-2 at ¶¶ 16-23; Doc. No. 90-1 at ¶¶ 16-23; Doc. No. 90-4 at ¶¶ 16-23). Among those who actually treated and evaluated Plaintiff was Defendant Yearick himself. (Doc. No. 90-3 at ¶ 23; Doc. No. 90-2 at ¶ 23; Doc. No. 90-1 at ¶ 23; Doc. No. 90-4 at ¶ 23). Accordingly, not only was Defendant Yearick not deliberately indifferent to any purported medical need of Plaintiff to receive mental health services, no other health care providers at PCI or MCI were either. And, as noted above with respect to Defendants Lewis, Beddingfield, White, and Lancaster, Plaintiff also wholly fails to allege that Defendant Yearick "knew of and

disregarded" an "excessive risk" to Plaintiff's mental health. In the absence of any such excessive or serious risk to Plaintiff's mental health, and in light of the treatment Dr. Yearick and other mental health care providers furnished to Plaintiff, Dr. Yearick was not deliberately indifferent to Plaintiff's medical needs and therefore, Defendant Yearick is entitled to summary judgment alternatively on the merits.

**2. Plaintiff's Deliberate Indifference Claim against Defendant Rickman**

Next, as to Dr. Rickman, Plaintiff is essentially alleging that, by refusing to move Plaintiff up the waiting list ahead of other inmates for the filling of two teeth, Dr. Rickman was deliberately indifferent to his alleged serious dental needs. The record evidence establishes that, far from being indifferent to Plaintiff's dental needs, Dr. Rickman promptly saw and treated Plaintiff. Dr. Rickman provided Plaintiff with a comprehensive dental evaluation on October 15, 2012, and appropriately established a treatment plan for two of Plaintiff's teeth for fillings. Plaintiff was then placed on the waiting list for those fillings, per MVCI and DPS policy. Plaintiff never declared a dental emergency and, furthermore, the affidavits of Dr. Rickman and Dr. Ray establish that teeth #13 and #15 did not require immediate or urgent treatment. In sum, Dr. Rickman rendered Plaintiff proper dental care, performing full mouth x-rays and a comprehensive exam. Dr. Rickman planned appropriate treatment, which Plaintiff eventually received.

The gist of Plaintiff's chief complaint against Dr. Rickman is that Plaintiff was not moved up the waitlist ahead of other MVCI inmates, who had been waiting longer than him, for the performance of routine dental care. However, "the prioritization of patients' complaints is not unreasonable and does not rise to a level of a constitutional violation." Morrell v. United States, No. 5:05cv171, 2007 WL 1097871, at *4 (N.D. W. Va. Apr. 12, 2007). Dr. Rickman and

the other dentists servicing patients at MVCI had limited time and resources, and had no choice but to triage patients. Dr. Rickman exercised sound clinical judgment in evaluating and treating Plaintiff and assigning him to the inmate waitlist for his fillings. As a matter of law, Dr. Rickman was therefore not deliberately indifferent to Plaintiff's needs, and Plaintiff has no evidence to the contrary.

Even assuming, for the sake of argument only, that Dr. Rickman was indifferent to Plaintiff's dental needs, Plaintiff must also prove that he was substantially harmed as a result, which he cannot do. See Smith, 845 F. Supp. 2d at 677. Two teeth are at issue in this case: #13 and #15. The affidavits and Plaintiff's subsequent dental records from other facilities show that tooth #15 was restored with a simple filling soon after Plaintiff was transferred from MVCI, and it is fully functional. Plaintiff has therefore suffered no harm with regard to that tooth.

Although tooth #13 had to be extracted, Defendants have submitted on summary judgment Dr. Ray's expert opinion, as well as Dr. Rickman's expert and clinical opinion, that as of October 15, 2012 (the date Dr. Rickman performed x-rays and a full evaluation of Plaintiff), more likely than not tooth #13 was hopeless and would have had to be extracted regardless of treatment. Thus, even if Dr. Rickman had been able to fill #13 on October 15 or sometime thereafter, Plaintiff still would have lost that tooth, and would be in precisely the same position as he is now. Plaintiff has not suffered any harm with regard to #13 either.

The record evidence in this case shows that there is no question of material fact and, as a matter of law, Plaintiff cannot prove that Dr. Rickman deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. Far from being indifferent to Plaintiff's needs, the dental records and Dr. Rickman's affidavit establish that Dr. Rickman provided a full dental evaluation and proper treatment planning to Plaintiff. The only reason that Plaintiff did not receive fillings

in teeth #13 and #15 at MVCI is that he was transferred from MVCI a mere two months after first being seen by Dr. Rickman and placed on the facility's waitlist that was at least three months long. The Eighth Amendment of the Constitution does not entitle Plaintiff to skip ahead of other inmates on the MVCI waiting list for the performance of routine dental care.

The Court has also considered Plaintiff's response to the summary judgment motion and finds that Plaintiff has not raised a genuine issue of disputed fact in his response. First, Plaintiff asserts in his response that "the dentist [at Piedmont Correctional Institution] who completed said evaluation [on July 24, 2012] advised me that teeth #13 and #15 could be repaired." (Doc. No. 92-2 at ¶ 2). As Defendant notes in his Reply, this statement is clearly inadmissible hearsay not falling within any exception. Furthermore, this statement is not supported by Plaintiff's dental records, which do not discuss the prognosis of any teeth on July 24, 2012. (Doc. No. 84-2).

Furthermore, the only new arguments advanced by Plaintiff in his response brief are that Dr. Rickman was deliberately indifferent for not assigning or causing DPS to assign dentists to work at MVCI on a fulltime basis; that DPS now has a system that integrates dental wait lists among facilities; that DPS has a policy that inmates must be seen within between 24 and 72 hours of submitting a sick call request; and that tooth #13 was repairable on July 24, 2012. None of these arguments alters the conclusion that Defendant Rickman is entitled to summary judgment. With regard to staffing at MVCI, Dr. Rickman first became employed as a dentist for DPS on the same day Plaintiff was transferred there. At no time during the next four months, before Plaintiff was transferred again, was Dr. Rickman in charge of, or had any control over, dental staffing or hiring at MVCI. (Doc. No. 99 at ¶ 3: Supplemental Rickman Aff.). He had no authority to set his own schedule or to assign other healthcare providers to work at MVCI. (Id.).

Plaintiff's bare, unsupported assertion that Dr. Rickman had this authority is entirely groundless and cannot be a basis for defeating summary judgment.

Furthermore, Defendant notes in his Reply that, although no single dentist was assigned fulltime to work at MVCI, multiple providers rotated through the facility each month seeing inmate patients. Waiting lists are also a necessary reality for prison medical care. See, e.g., Morrell v. United States, Doc. No. 5:05cv171, 2007 WL 1097871, at *4 (N.D.W.V. Apr. 12, 2007) ("[I]t is not unreasonable for the BOP to prioritize inmate injuries and the care they receive."). Again, Plaintiff is essentially alleging that the Constitution permits him to skip ahead of other inmates who had been waiting longer than he had for the same types of routine treatment. Far from being indifferent to Plaintiff's dental needs, Dr. Rickman saw him multiple times while he was incarcerated at MVCI and provided Plaintiff with reasonable care at all times.

Plaintiff also asserts in his response that that DPS now has implemented a system to integrate waiting lists among different DPS facilities when prisoners are transferred. Even if true, this statement is irrelevant. What system is in place and available now has no factual or legal bearing on this action or on Dr. Rickman's treatment of Plaintiff in 2012. See also FED. R. EVID. 407.

Plaintiff next argues in his response, without support, that there is a DPS policy that inmates must be seen within 24-72 hours of submitting a sick call request. Plaintiff attempts to cite to his affidavit, but does not provide a specific paragraph number. Moreover, his affidavit is devoid of any mention of this non-existent policy, and he has not filed or attached copies of any such policy. Again, a bare assertion that this policy exists, without any factual support, is insufficient to defeat summary judgment. Furthermore, Defendants assert that, to Dr. Rickman's knowledge, no such policy existed in 2012 and does not exist now, (Doc. No. 99 at ¶ 4), and they

further assert that it would be impractical, if not impossible, for every inmate to be seen by a dentist within a matter of days every time they requested appointments for routine care.

Finally, Plaintiff contends that tooth #13 was "repairable" on July 24, 2012. Plaintiff seems to be arguing that the tooth deteriorated between July and October 2012 to the point that its prognosis became very poor, and that this delay is attributable to Dr. Rickman. First, there is no evidence that tooth #13 was "repairable" on July 24, 2012, with the exception of Plaintiff's hearsay statement that the dentist at that visit told him the tooth "could be repaired." In any event, as discussed above, this statement is inadmissible hearsay. Furthermore, this assertion is not supported by Plaintiff's dental records, which do not discuss the prognosis of any teeth on July 24. Defendants note that Plaintiff has no dental training, so he cannot evaluate the prognoses of his own teeth. Additionally, assuming for the sake of argument only that a delay of less than three months caused tooth #13 to go from restorable to likely nonrestorable, this delay cannot be attributed to Dr. Rickman because Dr. Rickman did not see Plaintiff before October 12, 2012. In sum, for all these reasons, Defendant Rickman is entitled to summary judgment as to Plaintiff's claim against him for deliberate indifference to serious medical needs.

## IV.    CONCLUSION

In sum, for the reasons stated herein, the Court grants the summary judgment motions by Defendants.

Finally, although Defendant Avery County, the sole remaining Defendant, has not joined in the summary judgment motions, and has not been served in this matter, this Defendant shall likewise be dismissed as a Defendant for the same alternative reasons articulated in this Order as to the moving Defendants—that is, Plaintiff has not presented evidence of a disputed issue of fact to overcome summary judgment as to his deliberate indifference claims. Accord Al-Hashimi v. Scott, 756 F. Supp. 1567, 1569 (S.D. Ga. 1991) (stating that "[a]lthough the other

defendants ... did not join in the motion for summary judgment, the rationale for granting [the moving defendant's] motion applies equally to them" and, thus, granting summary judgment as to all defendants).

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motions for Summary Judgment, (Doc. Nos. 83, 89), are **GRANTED**.

2. The Clerk is instructed to terminate this action.


Signed: May 10, 2018

Frank D. Whitney
Chief United States District Judge